**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

FILED & ENTERED

JUL 09 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gasparia DEPUTY CLERK

| | |
|---|---|
| In re:<br><br>The Leather Factory Inc<br><br>                    Debtor(s). | Case No.: 1:05-bk-18708-GM<br><br>Chapter 7<br><br>**MEMORANDUM OF OPINION DENYING MOTION TO DISALLOW CLAIM NUMBER 211-1 OF VARLOW ENTERPRISES AND CLAIM NUMBER 60 OF CREDITOR HARRY ROSS INDUSTRIES AND DENYING SANCTIONS**<br><br>Date: June 19, 2012<br>Time:  10:00 a.m.<br>Courtroom: 303 |

On October 12, 2005, the Leather Factory filed its chapter 11 petition.  At the time that it filed, the Leather Factory was a vertically integrated company that manufactured and sold custom leather furniture built in its Montebello, California factory and sold in its twelve retail stores located throughout California.  The schedules showed $22,000+ in secured claims, $269,000+ in unsecured priority claims, and $4.6+ million in unsecured claims (of which about $2 million was owed to non-insiders).  The assets (all personal property) were valued at $2.3 million.

A creditors' committee was appointed and the debtor was immediately subject to a series of motions for relief from stay by the landlords.  It rejected some leases as early as December 2005 and continued to operate as a debtor-in-possession until its case was converted to chapter 7 on March 9, 2007.  David Seror was appointed as the trustee and he continued to oversee a series of avoidance power actions as well as carry out the other duties required of the trustee.

-1-

As of February 2012, the trustee had $236,000 in cash.  He anticipated that the chapter 7 costs of administration would be about $74,000.  After reviewing the administrative claims, he determined that the case was administratively insolvent and that the chapter 11 administrative claimants would be paid only about 13.5% of their claims.  The trustee accordingly sought disgorgement from chapter 11 professionals who had previously received interim payments in excess of 13.5% of their allowed administrative claims.  One of the firms from which disgorgement is sought is the Friedman Law Group, P.C. ("Friedman"), chapter 11 counsel to the debtor.

The trustee concluded that, other than some duplicates, the chapter 11 administrative claims appeared to be legitimate and that he would not be filing objections.  However, the trustee did not oppose Friedman filing objections to claims, since Friedman is an interested party who is trying to reduce the amount of the required disgorgement.

In January 2012, Friedman filed a series of objections to the chapter 11 administrative claims of the former landlords, on a variety of grounds.  All except two of these objections have been resolved, and the facts of these two remaining claims – those of Harry Ross Industries ("HRI") and Andrew Varlow dba Varlow Enterprise ("Varlow") – are substantially similar.  These last two objections focus on whether rent for the period immediately after the petition date until the first post-petition lease payment came due ("stub rent") is a pre-petition unsecured claim or an administrative claim, whether the security deposit must be applied toward the landlord's unsecured claim or its administrative one, and whether the landlord is entitled to its attorneys' fees and the amount of those fees.  The landlords have responded to Friedman's objections and also sought sanctions.

.

## STUB RENT

The bankruptcy was filed on October 12, 2005 and the next rent payment under the leases was due on or after November 1, 2005. Neither HRI nor Varlow had been paid the October rent prior to bankruptcy. The issue is whether the unpaid rent for the post-petition portion of October 2005 is a pre-petition obligation or whether it is entitled to an administrative priority. Bankruptcy Code §365(d)(3) requires the trustee to perform all lease obligations "arising" post-petition and grants such obligations administrative claim status, but there is a split between Circuit Courts of Appeals over whether leasehold obligations "arise" under §365(d)(3) when they are due (in this case on October 1, making them pre-petition) or when they accrue (in this case, over the month of October, making rent from October 12-31 post-petition and entitled to administrative status).

This split between circuit courts is over a single sentence in 11 U.S.C. §365(d)(3), which states that the "trustee shall timely perform all the obligations of the debtor, except those specified in §365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected."[1] Prior to the amendment of the Bankruptcy Code adding this section, although landlords were entitled to post-petition rent, etc. as an administrative expense, the burden was on the landlord to seek collection rather than on the debtor to make the payments. Payments could be delayed at the discretion of the bankruptcy judge and could be less than the contract amount. While it is universally agreed that §365(d)(3) was intended to alleviate the landlord's burden and risk regarding post-petition lease

---

[1] All statutory citations are to 11 United States Code, unless otherwise noted.

payments by shifting it to the trustee or debtor-in-possession,[2] the Third and Seventh Circuits (and a number of lower courts) have disagreed on the standard for whether a lease obligation "arises" post petition.  This split follows an ongoing debate as to whether the language of §365(d)(3) is ambiguous or not.

A number of courts, led by the Third Circuit, have found the language of §365(d)(3) to be unambiguous and to compel the result that obligations must be paid at the time they are due under the lease.  Concluding that the obligation "arises under a lease for the purposes of §365(d)(3) when the legally enforceable duty to perform arises under the lease," the Third Circuit reluctantly adopted the billing approach rather than the pre-Code proration approach.  Centerpoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 268 F.3d 205, 211 (3d Cir. 2001); see also, e.g., Burival v. Creditor Comm. (In re Burival), 406 B.R. 548, 553 (B.A.P. 8th Cir. 2009)(rent); In re Krystal Co., 194 B.R. 161, 163-64 (Bankr. E.D. Tenn. 1996)(property tax obligations).

On the other hand, those courts who find §365(d)(3) to be ambiguous look to the issues of equity and of bankruptcy policy and generally apply the "accrual" method to the question of when rent and tax obligations arise post-petition.  See, e.g., Heathcon Holdings v. Dunn Indus. (In re Dunn Indus.), 320 B.R. 86, 89-90 (Bankr. D. Md. 2005); (property tax obligations); In re Travel 2000, Inc., 264 B.R. 444 (Bankr. W.D. Mich. 2001)(rent).  In the context of a tax obligation that had already accrued but which the debtor was not obligated to pay to the landlord until it was actually billed, the Seventh Circuit held that the

---

[2] For ease, the term "trustee" is used throughout this opinion even though duties of a trustee are placed on a debtor-in-possession.  § 1107(a).

-4-

> 'billing date' approach is a possible reading of section 365(d)(3), but it is neither inevitable nor sensible. It is true that Handy Andy's obligation to National to pay (or reimburse National for paying) the real estate taxes did not crystallize until the rental due date after the taxes were paid. But since death and taxes are inevitable and Handy Andy's obligation under the lease to pay the taxes was clear, that obligation could realistically be said to have arisen piecemeal every day of 1994 and to have become fixed irrevocably when, the last day of the year having come and gone, the lease was still in force. . . .
> . . . .
> . . . Handy Andy's debt to National for 1994 and earlier 1995 taxes relates entirely to an earlier period, and is thus no different from its debts to trade creditors for supplies that it bought in 1994 but never paid for. . . .

In re Handy Andy Home Improvement Ctrs., 144 F.3d 1125, 1127 (7th Cir. 1998). The court found the accrual approach more sensible than the billing date approach because it tracks the purpose of the Bankruptcy Code by giving post-petition creditors a high priority so as to keep the debtor operating for as long as possible. Id.

Timing is crucial and increases the complexity of this interpretation issue. In Handy Andy the estate was benefitted under the accrual method because it classified the landlord's claim for taxes as pre-petition, even though it was contractually billed to the debtor post-petition. The facts of this case would work in an exactly opposite manner: the estate would benefit under the billing date method since the entire October rent payment would be classified as pre-petition.

At the back-end of the §365(d)(3) period, Courts of Appeals have used a more uniform approach: they have denied the trustee's request to prorate rent that comes due immediately before the rejection, but actually covers a period beyond the rejection. The courts find no ambiguity in the language of §365(d)(3) on this point. Although this rule provides a windfall to the landlord at the expense of other creditors, the statute is clear and the control of the date of rejection is in the hands of the trustee, not of the landlord. For example, in HA-LO Industries v. CenterPoint Properties Trust, 342 F.3d 794 (7th Cir. 2003), the rent was due on November 1 and the rejection took place on

November 2. The Seventh Circuit required the debtor to pay its November rent in full and distinguished its <u>Handy Andy</u> opinion by limiting <u>Handy Andy</u> to non-rent "sunk costs" that relate to a time before the bankruptcy case, as opposed to rent arising wholly post-petition, which is the consumption of a resource during the administration of the case.

The Sixth Circuit reached the same result on similar facts in <u>Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc)</u>, 203 F.3d 986 (6th Cir. 2000)(rejection on second day of month, rent due on first). Citing legislative history, the court noted that the purpose of §365(d) was to "'to relieve the burden placed on nonresidential real property landlords (or 'landlords') during the period between a tenant's bankruptcy petition and assumption or rejection of a lease.'" <u>Id.</u> at 989. The <u>Koenig</u> court found that the debtor or trustee was in control of the landlord's right to payment of the December rent since it could have rejected the lease two days earlier and would not have been obligated to pay for December. Thus equity as well as the statute favored the landlord.

Because the courts are split on the issue of stub rent, I specifically asked for Ninth Circuit authority, which Friedman failed to provide. The only case in the Ninth Circuit that Friedman cites, <u>In re Designer Doors, Inc.</u>, 389 B.R. 832 (Bankr. Ariz. 2008), does not deal specifically with stub-rent. <u>Designer Doors</u> notes that there is not yet a preferred approach in the Ninth Circuit for determining which lease obligations should be treated as administrative priorities, but gives a well-reasoned analysis on why the court should only give administrative priority status to payments or performance due after the petition is filed.

The only Ninth Circuit appellate opinion anywhere near on point is TreeSource Indus. v. Midway Engineered Wood Prods. (In re TreeSource Indus.), 363 F.3d 994 (9th Cir. 2004), which discusses a situation where the obligation did not arise until the lease was terminated.  However the court noted that for tax and rent obligations "the relevant time to determine whether the obligation is pre- or post-petition is when the obligations accrue and not necessarily when performance must take place. . . ." Id. at 998.  Although this statement is dicta (and thus ignored by Designer Doors), I believe that it must be considered in issues of back-end obligations at the end of the lease or on rejection,  though not necessarily in dealing with stub rent.

In re Picturesque, L.L.C., 2006 Bankr. LEXIS 3689 (Bankr. D. Ariz. Dec. 22, 2006), never mentions TreeSource, which preceded it by two years, but notes the circuit split between the Seventh Circuit and the Third Circuit and follows the slight majority of cases that accept the proration (as opposed to the billing) theory for stub rent.

While I agree that there is little or no ambiguity in §365(d)(2) on the rejection end of the lease and that, as a matter of equity, the date of rejection is solely in the hands of the debtor and the debtor should have realized the implications of the date chosen, I do not think the language of §365(d)(3) or the equities are so clear on stub rent at the front end.  Accordingly, it is appropriate to look to the legislative intent.  Congress intended to shift the burden from the landlords for the debtor's use of their property.  To allow "stub rent" to be considered as a pre-petition unsecured claim gives a windfall to the debtor and its administrative creditors at the expense of the landlord, who has no ability at that time to evict because of the automatic stay.  I find that the rent for the days after the filing of the petition until the next lease payment is due are an administrative claim under §365(d)(3) in a prorated amount of a full monthly lease payment, in accord with

TreeSource and that slight majority of courts following the accrual rule. To rule otherwise would reward the estate to the detriment of the landlord, which was not the intent of Congress.

Landlords also argue that the use of the premises during the "stub" period would be an administrative claim under §503(b), even if §365(d)(3) does not clearly make it so (since §365(d)(3) only deals with the requirement of the trustee to act and does not categorize the claim). In re Sportsman's Warehouse, Inc., 436 B.R. 308 (Bankr. D. Del. 2009); see also In re Goody's Family Clothing Inc., 610 F.3d 812 (3d Cir. 2010) ("We hold that §365(d)(3) does not supplant § 503(b) and the Landlords are entitled to "stub" rent as an administrative expense."). While this is a very sensible argument, it flies in the face of Cukierman v. Uecker (In re Cukierman), 265 F.3d 846 (9th Cir. 2001)(citing Towers v. Chickering & Gregory (In re Pacific-Atlantic Trading Co,), 27 F.3d 401 (9th Cir. 1994)):

> We have held that claims arising under §365(d)(3) are entitled to administrative priority even when they may exceed the reasonable value of the debtor's actual use of the property. *See* Pacific-Atlantic, 27 F.3d at 405. We did so because the "notwithstanding section 503(b)(1)" proviso exempts the amount of lease obligations that a trustee must timely pay under §365(d)(3) from §503(b)(1)'s limitation of administrative expenses to the fair value of the debtor's use of the property. Id. When the trustee fails to pay an obligation, the amount accorded administrative priority is similarly not subject to the §503(b)(1) limitation. Id. We reasoned that to hold otherwise would reward trustees for failing to perform lease obligations, a result entirely at odds with §365(d)(3)'s purpose of ensuring prompt payment for landlords. Id.

Cukierman, 265 F.3d at 850. Even though post-petition lease claims seem to fall under the definition of an administrative claim in §503(b), these claims are granted priority under §365(d)(3) and it is questionable whether a post-petition use of the premises can qualify under §503(b) if it is disqualified under §365(d)(3). But since I find that the landlords are entitled to their stub rent as an administrative priority under §365(d)(3), I need not analyze the §503(b) issue at this time.

## SECURITY DEPOSIT

Friedman argues that HRI's security deposit should be applied against HRI's administrative claim for post-petition rent, rather than the unsecured claims for pre-petition arrearages and lease rejection pursuant to Bankruptcy Code §502(b)(6). (Varlow had applied its security deposit prior to the petition date and thus the issue is moot since it already reduced the pre-petition claim and the security deposit never became property of the estate.)  HRI does not dispute that the security deposit can reduce the amount of its claims, but argues that it is the pre-petition arrearages or rejection claims that are affected, not the administrative claim.

The application of the security deposit is governed by the terms of the lease. The applicable provision, paragraph 5 of the HRI lease, provides that the security deposit may be applied by the landlord if the lessee fails to pay rent, or otherwise defaults under the lease.[3]  There is no requirement that it be applied at all, although at the termination or expiration of the lease it must be either applied or returned to the lessee.  The security deposit is not in trust and is property of the estate, but is clearly meant to be used to protect the landlord against a default.

Without the bankruptcy, there would be no issue since there would be a single claim for default under the lease. But the bankruptcy actually creates three separate categories of claims (a general unsecured claim for pre-petition arrearages, a general unsecured claim for rejection damages under §502(b)(6), and an administrative claim for post-petition damages). The lease does not deal with how to apply the security deposit in case of a bankruptcy filing by the tenant. Without direction from the lease, the Court considers applicable law.

---

[3] Legible copies of this portion of the lease has been filed as Exhibit 1 to Amended Claim #60-2 (HRI).

Section 502(b)(6) Cases

Most cases decided under Bankruptcy Code §502(b)(6) are not directly relevant to the question at hand. A number of cases have applied security deposits to reduce §502(b)(6) rejection damages, but they start from the premise that the security deposit will be applied against rejection damages. The issue in those cases is whether the deposit should be applied against the rejection claim (i) prior to limiting the claim under the §502(b)(6) cap or (ii) after the rejection claim is capped, having the effect of reducing the statutory rejection claim. They have not explicitly considered the rights of the landlord to apply the deposit to the rejection damages claim (or other pre-petition claims) *as opposed to* applying it to an administrative claim for post-petition rent.

Oldden v. Toronto, 143 F.2d 916 (2d Cir. 1944), a pre-Code case, is the model for the post-Code holdings. It considers whether a security deposit should be deducted from the total claim or from the "allowable" claim for damages due to the post-petition rejection of the lease (calculated under then 11 U.S.C. §63, sub. A(9), which limits the claim for future rents). Oldden holds that the landlord must apply the security deposit to the "allowable claim" as capped by §63, as it would be unfair to give the landlord the large rejection claim without taking into consideration and applying the security deposit to it.

Legislative history indicates that Congress intended to uphold Oldden when it enacted §502(b)(6). The House and Senate Reports read in relevant part:

> The history of this provision is set out at length in Oldden v. Tonto Realty Co. . . . . It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate. The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or ten percent of the remaining lease term, not to exceed three years . . . . This subsection does not apply to limit administrative expense claims for use of the leased premises to which the landlord is otherwise entitled.

> This paragraph will not overrule Oldden, or the proposition for which it has been read to stand: To the extent that a landlord has a security deposit in excess of his claim allowed under this paragraph, the excess comes into the estate. . . . As under Oldden, he will not be permitted to offset his actual damages against his security deposit and then claim for the balance under this paragraph. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under this paragraph.

H. Rep. No. 95-595, 95th Cong., 1st Sess. 353-54 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 63-64 (1978).

Post-Code cases have generally followed Oldden: when applying security deposits to rejection damages claims, they have done so after the §502(b)(6) cap has been applied, essentially reducing the amount of statutory damages under §502(b)(6). See, e.g., AMB Prop. v. Official Creditors Committee of AB Liquidating Corp. (In re AB Liquidating Corp.), 416 F.3d 961 (9th Cir. 2005); In re All for a Dollar, 191 B.R. 262, 264 (Bankr. D. Mass. 1996)(quoting legislative history at length); Redback Networks, Inc. v. Mayan Networks Corp. (In re Mayan Networks Corp.), 306 B.R. 295 (9th Cir. BAP 2004) (deducting not only cash security deposits but also draws on letters of credit against the statutory rejection claim, so long as the letter of credit draw had the effect of reducing estate assets). In Mayan, although the landlord had filed an administrative priority claim for over $50,000, neither the parties nor the court dealt with the possibility that the security deposit should be credited toward that portion of the claim.

The second paragraph of the legislative history quoted above arguably extends the meaning of Oldden beyond both its original holding and the holdings of this line of cases: not only *how* security deposits should be applied against §502(b)(6) rejection claim, but also *that* security deposits should be applied against §502(b)(6) rejection claims.

Section 365(d)(3) Cases

Several cases under Bankruptcy Code §365(d)(3) offer more guidance and explicitly consider whether a security deposit should be applied against administrative

-11-

claims for post-petition rent under §365(d)(3) or against pre-petition claims (whether pre-petition arrearages or rejection claims).  These cases have uniformly held that the security deposits should be applied against the general unsecured claims (whether for pre-petition arrearages or statutory rejection damages).

In re PYXSYS Corp., 288 B.R. 309 (Bankr. D. Mass. 2003) deals with a trustee who wished to setoff the security deposit against both an administrative claim for post-petition rent under §365(d)(3) and use and occupancy charges under §503(b).  After determining the amount of the administrative claim, the court held that it was clearly Congress's intent that the security deposit be applied to the pre-petition arrearages and lease rejection damages and not to post-petition claims.  Id. at 319.  The PYXSYS court read the second paragraph of §502(b)(6)'s legislative history quoted above as authority not only for applying the security deposit against the capped amount of the rejection claim, but also for applying the security deposit against the §502(b)(6) rejection damages in the first place (and not against administrative claims).  Id. at 319.  See also In re All for a Dollar, 191 B.R. at 264 ("[T]he legislative history of §502(b)(6) signals Congress' intention not to reduce the statutory cap by postpetition rentals and not to categorize security deposits and postpetition rentals together.").

In re Far West Corp., 120 B.R. 551 (Bankr. E.D. Cal. 1990) was similar to this case before the Court because the landlord was seeking post-petition rents, interest and attorneys' fees as an administrative claim and it concerned the proper application of a security deposit paid to the landlord at the initiation of the lease over ten years before the bankruptcy.  In that case the parties agreed that generally a security deposit could not be applied against a post-petition administrative rent claim, but should be applied against any pre-petition, unsecured claim of the landlord.  But the debtor argued that the

deposit was really payment of the last two months of rent under the lease and thus should be offset against the landlord's post-petition claims. The court reviewed the lease and determined that the security deposit was to be applied to the last two lease payments only if the debtor was not in default under the lease. Since there were substantial pre-petition defaults, the option to use the security deposit for the last two lease payments had lapsed and so it was to be applied to the outstanding pre-petition rent payments. Id. at 553.

Finally, Pereira v. Rich Taubman Assocs. (In re KP Fashion Co.), 2011 U.S. Dist. LEXIS 96466 (S.D.N.Y. Aug. 26, 2011) concerned a security deposit in the form of a standby letter of credit. It is factually confusing since it seems that the landlord drew on the letter of credit (possibly prior to the bankruptcy) and applied it to its pre-petition debt. The trustee apparently sought to recharacterize this draw so that it would be applied to the administrative claim. The court, citing to PYXSYS and Far West, held that it was proper for the landlord to apply this letter of credit draw/security deposit to the pre-petition claim, rather than the administrative claim.

Setoff Cases

A different line of cases has analyzed the rights of debtors to setoff security deposits against landlords' administrative claims. These cases have concluded that the pre-petition security deposits and post-petition administrative claims lack mutuality of obligation and cannot be set off. They generally assume or conclude that the security deposit *can* be set off against pre-petition arrearage claims and rejection damages, consistent with Colliers. 5 Collier on Bankruptcy ¶ 553.03 [3][c][iii] ("[A] landlord may offset a security deposit against a claim for pre-petition rent . . . .").

In re Genuity Inc., 323 B.R. 79 (Bankr. S.D.N.Y. 2005) involved security deposits

under a variety of telecommunications contracts.  As the court succinctly stated: "At issue is whether the Debtors are entitled to use the Pre-Petition Deposits to offset their post-petition cure obligations.  In a word, the answer is no." Id. at 83.  The court noted that the debtor and debtor in possession are separate and distinct entities, so that there is no mutuality of obligation between the pre-petition security deposits and the post-petition cure obligations.  The court also felt it would be unfair for the debtor to apply the deposits to the cure obligations rather than the arrearages; the purpose of the deposits was to safeguard parties contracting with the debtor against the effect of just such defaults.  The court clearly intended that its decision would enable the telecommunications providers to apply the deposits against debtors' pre-petition arrearages.

In In re Telligenix Corp., 436 B.R. 211 (Bankr. M.D. Fla. 2010) the court denied the debtor's motion to apply its post-petition rent obligations under a commercial real estate lease against the security deposit.  The court stated that, as both the security deposit and the rejection damages are pre-petition claims, "bankruptcy courts routinely allow a landlord to offset rejection damages claims against security deposit funds." Id. at 213. The court "stop[ped] short of holding that post-petition administrative priority claims can *never* be set off against pre-petition debts owed to the debtor." Id. at 215 (emphasis in the original).  But the court did not find any of the "narrow circumstances" that might justify such a setoff in the instant case and allowed the landlord to setoff the security deposit against the rejection damages.

The court in In re Go Fig, Inc., 2009 Bankr. LEXIS 533 (Bankr. E.D. Mo. Feb. 5, 2009) held that a Chapter 7 trustee could not use recoupment to apply the security deposit against the landlord's §365(d)(3) administrative claim. The court distinguished

-14-

the pre-petition debtor and post-petition debtor as different legal entities, such that the administrative claim and the security deposit arose out of different transactions. The court also cited policy considerations: applying the deposit against administrative claims would effectively strip the landlord of the higher priority treatment that enables debtors to obtain post-petition services. Although recoupment was at issue, the very same analysis could be applied to setoff.

Finally, in In re Aspen Data Graphics, 109 B.R. 677 (Bankr. E.D. Pa. 1990) in the context of whether setoff was avoidable under Bankruptcy Code §547 and §553, the court stated that "a landlord may setoff the amount of a *security deposit* under a lease against a pre-petition claim for rent and damages owed to the landlord, as these are mutual, pre-petition obligations." Id. at 683 (emphasis in original).

Conclusion as to the Application of the Security Deposit

Precedent under both §365(d)(3) and §553 overwhelmingly holds that pre-petition security deposits may be applied against pre-petition claims, whether arrearages or rejection damages, rather than administrative claims. These holdings are consistent with the legal principle of mutuality of obligation being required for setoff and the legal distinction between pre-petition and post-petition obligations and legal entities. They are also consistent with the purpose of §365(d)(3) and fundamental fairness. The Bankruptcy Code protects the landlord by requiring the trustee to pay the landlord for use of the premises post-petition until the lease is rejected. Allowing the trustee to use the premises to benefit the estate and then pay for that use, not with the cash contemplated by §365(d)(3) but with the security deposit designed to protect the landlord against defaults, both strips the landlord of the protections of §365(d)(3) and unfairly benefits the estate at the expense of the landlord. (This conclusion is also

consistent with case law interpreting the legislative history of §502(b)(6) as requiring application of security deposits to rejection claims.)  Accordingly, this Court rules that HRI's security deposit should be applied against its pre-petition claims, both arrearage and rejection damages, not its administrative claims.

HRI argues that even if the security deposit was applied to debtor's obligations under §365(d)(3), that draw down on the security deposit triggers debtor's lease obligation to refresh the security deposit, which would be an administrative claim under the logic of Cukierman (that the debtor must fulfill all lease obligations under §365(d)(3) and all such obligations become administrative claims).  Hence, applying the security deposit against HRI's §365(d)(3) administrative claim, would simply create a new administrative claim (to refresh the deposit) in the same amount.  Because I am ruling in favor of HRI by concluding that the deposit should be applied against HRI's pre-petition arrearages and rejection claim, I will not devote further attention to this argument.

## ATTORNEY'S FEES

HRI is not claiming attorneys' fees as part of its administrative claim.  In his original response to the objection, Varlow asserted a request for attorneys' fees for defending this objection to his claim.  Since then he has revised his request, limiting it to the fees and costs incurred in defending the motion to reject the lease.  Varlow is entitled to attorneys' fees from the date of the petition to the time of surrender, but not after that.  Cukierman makes it clear that under §365(d)(3), the court is to follow the lease and not use the measure of reasonableness, etc. unless that is part of the lease. Paragraph 31 of the Varlow lease does require that the fees be reasonable and that they will be allowed to the prevailing party on any action to enforce the terms of the

lease, whether such action or proceeding is pursued to judgment. The landlord is also entitled to fees and costs incurred in preparing notices of default, whether or not a legal action is taken.[4]

Varlow asserts that the amount actually incurred through to the defense of the Motion to Reject the Lease was $1,225 for Mr. Goodman and $3,165.25 for Ms. Nelson. No back-up documentation has been given.[5] The docket reveals that Varlow filed a limited opposition and objection to the motion to reject the lease, based on a lack of notice and timing, and demanded a hearing.[6] The content of that opposition shows that there were multiple contacts and attempts to contact debtor and its counsel in the period leading up to the rejection and that the lease was in pre-petition and post-petition default. Replies to the opposition were filed and a short hearing was held on February 8, 2006. The court granted the motion to reject, but deemed this to be effective on January 8, 2006 (rather than on December 1, 2005, as requested in the motion). Thus Varlow was the prevailing party. Although there is no breakdown, the total fees and costs requested appear to be reasonable for the amount of work that was done. And these are entitled to an administrative priority. In re Multiple Allied Servs., 2010 Bankr. LEXIS 3895 (Bankr. N.D. Cal. Oct. 15, 2010).

## SANCTIONS

Although I am not happy about the failure of Friedman to just admit that there is little or no authority for its statement that many courts in the Ninth Circuit use the billing date approach, this is not a frivolous motion, but rather it deals with an unclear area of law, as can be seen by my long analysis. Sanctions are denied.

---

[4] A legible copy of this portion of the lease has been filed as doc. #406.
[5] Doc. #385.
[6] Doc. #46.

## CONCLUSION

HRI's administrative claim is $70,558, its claim for pre-petition arrearages is $115,174 and its rejection claim under 11 USC §502(b)(6) is $245,343. The security deposit is $24,000 and is to be applied to the pre-petition arrearage claim, reducing it to $91,174.

Varlow's administrative claim is $45,236.85. This is calculated by apportioning the month of January 2006 between an administrative claim (though January 8, 2006) and a rejection claim for the balance of the month. As stated above, Varlow appears to be entitled to an administrative claim for the rent for the full month of January 2006, but that has not been requested.[7] The Varlow unsecured claim of $98,108.64 is not affected by this ruling.

###

DATED: July 9, 2012

_____
United States Bankruptcy Judge

---

[7] Doc. #385.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): )_ **MEMORANDUM OF OPINION REGARDING DENYING MOTION TO DISALLOW CLAIM NUMBER 211-1 OF VARLOW ENTERPRISES AND CLAIM NUMBER 60 OF CREDITOR HARRY ROSS INDUSTRIES AND DENYING SANCTIONS** _____
was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of (*date*)_____, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

Gregory Abrams Email: jbothell@askfinancial.com
Jerome Friedman Email: jfriedman@jbflawfirm.com
David Seror Email: kpscion@ebg-law.com
Sheila Nelson Email: shedoesbklaw@aol.com
Michael Greger Email: mgreger@allenmatkins.com
Richard Dinets Email: rdinets@allenmatkins.com

☐ Service information continued on attached page

**2. SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

The Leather Factory Inc.
c/o Larry Katz
5776 Lindero Canyon Road
Westlake Village, CA 91362

☐ Service information continued on attached page

**3. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐ Service information continued on attached page